422 A.2d 1097

**Frank P. MURPHY, Individually and as Representative of all those similarly situated male, insured residents of the Commonwealth of Pennsylvania and as a Representative of all similarly situated unmarried, insured residents of the Commonwealth of Pennsylvania and as a Representative of all similarly situated residents of the Commonwealth of Pennsylvania under age 30, Appellants,**

**v.**

**HARLEYSVILLE MUTUAL INSURANCE COMPANY, Individually and as Representative of all those automobile insurance carriers doing business in the Commonwealth of Pennsylvania.**

Superior Court of Pennsylvania.

Argued Dec. 5, 1979.

Filed Nov. 7, 1980.

Reargument Denied Feb. 10, 1981.

Petition for Allowance of Appeal Denied May 11, 1981.

---

Frank P. Murphy, Norristown, and Bernard V. DiGiacomo, Norristown, for appellants.

James J. McCabe, Jr., Philadelphia, and William H. Pugh, IV, Norristown, for appellees.

Before PRICE, WATKINS and HOFFMAN, JJ.

PRICE, Judge:

The instant appeal is from the order by the trial court sustaining appellee's preliminary objections to appellant's complaint in assumpsit. Finding no error, we affirm.

On June 20, 1979, appellant, an attorney, brought a class action suit on behalf of himself and all other parties similarly situated alleging discrimination in the setting of automobile insurance rates by appellee and all other providers of automobile insurance in the Commonwealth. In his capacity as the named plaintiff, appellant purported to represent three groups of residents of the Commonwealth that had purchased automobile insurance from the defendants: (1) all males; (2) all unmarried persons; and (3) all persons under the age of thirty years. Appellant alleged that discrimination against the first group violated the equal rights amendment of the Pennsylvania Constitution [1] and that discrimination against all three categories violated the equal protection clause of the fourteenth amendment to the federal constitu-

---

1. "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." Pa.Const. art. 1, § 28.

tion.[2] Relief was requested in the form of a rebate for all excess premiums paid as a result of the discrimination. In addition to proceeding as the named plaintiff, appellant Frank P. Murphy purported to act as one of the two named attorneys for the plaintiff class and stated that he would share in the awarding of any attorney fees under the contingent fee agreement by which counsel was retained. On July 7, 1978, appellee filed preliminary objections alleging, *inter alia*, a conflict of interest in Frank P. Murphy proceeding as the representative plaintiff and as counsel for the class of plaintiffs and demurring to the complaint. The trial judge sustained these objections and held that the complaint could not proceed as a class action suit and sustained the demurrer to the substantive allegations and ordered the complaint to be dismissed. It is from this order that appellant appeals.

First, we agree with the trial court that a conflict of interest exists with respect to Frank P. Murphy proceeding as the representative plaintiff and as co–counsel for the class of plaintiffs. Pa.R.C.P. No. 1702(4) provides that in determining whether a case may proceed as a class action, consideration should be given to whether "the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709 . . . ."

Among the criteria mentioned in Rule 1709 is "whether the representative parties have a conflict in interest in the maintenance of the class action . . . ." Pa.R.C.P. No. 1709(2). An example of such a debilitating conflict is given in the Explanatory Note accompanying Rule 1709 as having occurred in the case of *Kramer v. Scientific Control Corp.*, 534 F.2d 1085 (3d Cir.), *cert. denied sub nom.*, 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976) in which a partner in the same law firm as one of the two named attorney–plaintiffs served as attorney for the class of plaintiffs. In holding that such a relationship created a conflict of interest which mandated

2. "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S.Const. amend. XIV.

disqualification of the law firm from representing the class of plaintiffs, Judge Aldisert engaged in discussion expressly pertinent to the instant case. Judge Aldisert reasoned that without question, if the plaintiff attorney had attempted to serve as attorney for the class and share in the proceeds of any funds from which attorneys' fees would be awarded, a classic conflict of interest would exist. Given this conflict, representation by an associate or partner from the same office would also create a conflict under the appearance of impropriety standard of Canon 9 of the Code of Professional Responsibility and under Disciplinary Rule 5–101 and 5–102.[3] With respect to the conflict of interest in an attorney–plaintiff sharing in the potential award as both a party and attorney for the class, the Court of Appeals for the Third Circuit stated,

"Appellees do not appear to contest seriously that, in the circumstances of this case, it would have been improper for Kramer, the class representative, to designate himself as counsel for the class.

. . . Clearly he perceived that he could be accused of a conflict of interest were he to anticipate a share of the potential court–awarded attorneys' fee in addition to his recovery as a member of the class.

. . . Given the possible conflict of interest between the class member plaintiff *qua* plaintiff and the class member plaintiff *qua* counsel, under circumstances in which an equitable fund may be created from which an attorney's fee may be awarded, we agree that a plaintiff class representative could not, with complete fidelity to Canon 9, serve as class counsel." *Id.* at 1089–90.

Although the courts of this Commonwealth have yet to determine whether a dual representation as in the instant fact situation will serve to bar certification as a class action

**3.** Canon 9 establishes that an attorney should "avoid even the appearance of impropriety" and Disciplinary rules 5–101 and 5–102 provide that an attorney should refuse employment when outside interests may impair the judgment of the attorney or someone from his office will be called as a witness.

under Rule 1709, the supreme court has utilized the "appearance of impropriety" standard to disqualify an attorney or his firm from representing a client. *See Commonwealth v. Eastern Dawn Mobile Home Park, Inc.*, 486 Pa. 326, 405 A.2d 1232 (1979) (opinion in support of affirmance); *American Dredging Co. v. City of Philadelphia*, 480 Pa. 177, 389 A.2d 568 (1978). Moreover, various federal courts have held that dual service of the type here in question creates a conflict of interest, *see Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102 (5th Cir. 1978) (dicta); *Susman v. Lincoln American Corp.*, 561 F.2d 86 (7th Cir. 1977) (dicta); *Kramer v. Scientific Control Corp., supra* (dicta); *Conway v. City of Kenosha, Wisconsin*, 409 F.Supp. 344 (E.D.Wis.1975); *Seiden v. Nicholson*, 69 F.R.D. 681 (N.D.Ill.1976); *Graybeal v. American Savings & Loan Assoc.*, 59 F.R.D. 7 (D.D.C.1973); *Eovaldi v. First Nat'l Bank of Chicago*, 57 F.R.D. 545 (N.D.Ill.1972); *Shields v. First Nat'l Bank of Arizona*, 56 F.R.D. 442 (D.Ariz. 1972), which may justify a refusal to permit the case to proceed as a class action, *see Conway v. City of Kenosha, Wisconsin, supra; Graybeal v. American Savings & Loan Assoc., supra; Shields v. First Nat'l Bank of Arizona, supra.*

In light of the above precedents and the pronouncement in the Explanatory Note that Rule 1709 is based in part upon federal case law, we agree that the trial court ruled properly in refusing to certify the case as a class action.

Although appellant has failed in his attempt to maintain the instant proceeding as a class action, he may continue the suit on an individual basis. Nevertheless, the trial court sustained appellee's demurrer on the grounds that appellant failed to allege state action in support of his claims of discrimination based upon the fourteenth amendment equal protection clause.[4]

As long ago as the *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the United States Supreme Court

4. Appellant, pursuant to Pa.R.A.P. 2501(b), has been permitted to present and brief *Commonwealth v. Bonadio*, 490 Pa. 91, 415 A.2d 47 (1980). Because that case clearly involves state action, and in light of our conclusion herein, we do not find it to be controlling.

held that although the equal protection provision of the fourteenth amendment applies to "[s]tate action of every kind," it does not prohibit the "individual invasion of individual rights." *Id.* at 11, 3 S.Ct. at 21. Since that time, the state action requirement has become the *sine qua non* to the maintenance of a fourteenth amendment equal protection cause of action. What constitutes state action has perplexed courts for nearly a century and it is generally agreed that an ad hoc analysis is best employed requiring courts to engage in a process of "sifting facts and weighing circumstances." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). *See Gilmore v. City of Montgomery*, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974); *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

> "[T]he dispositive question in any state–action case is not whether any single fact or relationship presents a sufficient degree of state involvement, but rather whether the aggregate of all relevant factors compels a finding of state responsibility." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 360, 95 S.Ct. 449, 458, 42 L.Ed.2d 477 (1974).

Within the confines of this ad hoc approach, the Supreme Court has provided some guidance and in recent years has spoken in terms of requiring "a sufficiently close nexus between the State and the challenged action of the [defendant] so that the action of the latter may be treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453.

In the instant case, appellant argues that the scheme employed by the Commonwealth through the Casualty and Surety Rate Regulatory Act, Act of June 11, 1947, P.L. 538 §§ 1 *et seq.*, 40 P.S. §§ 1181 *et seq.*, for regulating the setting of insurance rates by Pennsylvania insurers creates a situation in which the Commonwealth has placed its imprimatur upon the alleged discriminatory actions by appellee. We disagree.

In *Jackson v. Metropolitan Edison Co., supra*, a similar claim of state action was made with respect to the approval

by the Pennsylvania Public Utility Commission of a provi-
sion contained in a general tariff application which authoriz-
ed Metropolitan Edison to terminate electric service without
notice to customers for nonpayment of electric bills. In
determining whether there was a sufficient nexus so that
the discontinuance of service to Jackson's residence without
notice was state action in violation of the fourteenth amend-
ment due process provision, the court noted that the utility
was a private company subject to "extensive regulation by
the Commission" as "a condition of holding its certificate" of
public convenience. *Id.* at 346, 95 S.Ct. at 451. Neverthe-
less, the court ruled that

> "[t]he mere fact that a business is subject to state regula-
> tion does not by itself convert its action into that of the
> State for purposes of the Fourteenth Amendment. Nor
> does the fact that the regulation is extensive and detailed,
> as in the case of most public utilities, do so." *Id.* at 350,
> 95 S.Ct. at 453 (footnote and citations omitted).

With respect to Jackson's claim that the approval by the
PUC of the tariff schedule containing the challenged termi-
nation provision translated into state action, the Supreme
Court noted that the filing of the tariff was intended to
provide notice to the public and the contents of the filing
became effective within sixty days, when not disapproved by
the Public Utility Commission. In those circumstances, the
Court drew a distinction between mere acquiescence by the
state to the termination provision as opposed to a situation
in which the state specifically orders a utility to undertake
the challenged practice.

> "The nature of governmental regulation of private utili-
> ties is such that a utility may frequently be required by
> the state regulatory scheme to obtain approval for prac-
> tices a business regulated in less detail would be free to
> institute without any approval from a regulatory body.
> Approval by a state utility commission of such a request
> from a regulated utility, where the Commission has not
> put its own weight on the side of the proposed practice by
> ordering it, does not transmute a practice initiated by the

utility and approved by the Commission into state action. At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so state action for purposes of the Fourteenth Amendment." *Id.* at 357, 95 S.Ct. at 456 (footnote omitted).[5]

Examining the instant case, we find numerous similarities with the fact situation in *Jackson*. As in *Jackson*, the automobile insurance companies in this Commonwealth are regulated and must design their rates in conformity with the provisions of the Rate Regulatory Act.[6] Once the rates are established, application is made to the Commissioner of Insurance and the rates become effective unless expressly disapproved within a period of up to sixty days. *See* Act of June 11, 1947, *supra,* § 4, 40 P.S. § 1184(d). The Act further provides that the commissioner need not scrutinize all proposed rates and that he "shall review such of the filings as it may be necessary to review in order to carry out the purposes of this Act." *Id.* 40 P.S. § 1184(c). Finally, both the Rate Regulatory Act and the Unfair Insurance Practices Act, Act of July 22, 1974, P.L. 589, §§ 1 *et seq.*, 40 P.S. §§ 1171.1 *et seq.*, prohibits discrimination in the setting of rates, *see* 40 P.S. §§ 1183(d), 1171.5(a)(7)(iii), although allowance is permitted, but not mandated, based upon loss experience and where there is an underwriting and actuarial

5. A similar distinction between mere permission versus compulsion was employed in *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (warehouseman selling property in possession under authority of uniform commercial code); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (private club could on its own initiative discriminate on basis of race, but would become state action if state required club to comply with its discriminatory by–laws).

6. Section 3 of the Act of June 11, 1947, *supra,* 40 P.S. § 1183 lists a rather wide range of factors that an insurance company shall consider in setting rates.

justification for any differentiation.[7]  *See* 40 P.S. §§ 1183(a), 1171.5(a)(7)(iii).

In light of the above summary, we conclude that the degree of governmental regulation in the instant proceeding is analogous to that found insufficient in *Jackson v. Metropolitan Edison Co., supra.  See Pennsylvania Insurance Dept. v. Philadelphia*, 196 Pa.Super. 221, 173 A.2d 811 (1961). Moreover, the challenged acts were carried out by the private party on its own initiative under the provisions of the Rate Regulatory Act which permits the fixing of rates based upon measured risk of loss, but were not required by the Commonwealth.  Although the Commissioner of Insurance failed to overturn the rate structure filed by appellee, this failure is analogous to that present in *Jackson* and "amounted to not more than a determination that [appellee] was authorized to employ such a practice if it is so desired."  419 U.S. at 357, 95 S.Ct. at 456.  The fact that appellee elected to exercise the choice permitted by statute does not, under the *Jackson* rationale, transform its election into state action.  *See Broderick v. Associated Hospital Service*, 536 F.2d 1 (3d Cir. 1976);  *Jackson v. Associated Hospital Service*, 414 F.Supp. 315 (E.D.Pa.1976), *aff'd*, 549 F.2d 795 (3d Cir.), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977) (finding no state action in Pennsylvania regulation of insurance companies).

Finally, appellant contends that even if a cause of action does not lie under the fourteenth amendment to the federal constitution, he may nevertheless continue his suit limited to alleged discrimination against all males under the equal rights amendment to the Pennsylvania Constitution.  The trial court ruled that a cause of action may not be brought under that amendment because like the federal equal protection clause, the Pennsylvania ERA applies only to instances of state discrimination and does not prohibit gender–based discrimination that is private in nature.  Thus, we are

7.  *See also* 31 Pa.Code § 145.1 prohibiting discrimination on the basis of sex or marital status but permitting different "premium rates between sexes where there is sound actuarial justification."

required to decide the vexing, and as yet unresolved issue [8] whether state action is a necessary element in maintaining a cause of action under the Pennsylvania ERA.

In resolving this issue, we note initially that the legislative history of the passage of the Pennsylvania ERA is sparse and offers little or no clue as to the intent of the amendment.[9] Nevertheless, some guidance may be gleaned from the fact that the amendment guarantees "equality of rights *under the law* . . . ." Pa.Const. art. 1, § 28. (emphasis added). Thus, the question becomes whether such a guarantee serves only as a restriction upon the Commonwealth or upon those activities so associated with the Commonwealth as to be deemed to have been done at the behest of the state, or whether the amendment also prohibits discrimination that is exclusively private in nature?

In *Lincoln v. Mid–Cities Pee Wee Football Assoc.*, 576 S.W.2d 922 (Tex.Ct.App.1979), plaintiff alleged discrimination under the Texas ERA[10] for discrimination against a private non–profit corporation that conducts football

---

**8.** In *Commonwealth of Pennsylvania by Israel Packel, Attorney General v. Pennsylvania Interscholastic Athletic Assoc.*, 18 Pa.Cmwlth. 45, 334 A.2d 839 (1975), the Commonwealth Court invalidated a by–law of the defendant PIAA that prohibited males and females from competing in athletic contests. In so doing, the court held that
> "[t]he concept of 'equity [sic] of rights *under the law*' (emphasis added) is at least broad enough in scope to prohibit discrimination which is practiced under the auspices of what has been termed 'state action' within the meaning of the Fourteenth Amendment to the United States Constitution." *Id.,* 18 Pa.Cmwlth. at 51, 334 A.2d at 842 (emphasis in original).

Because, however, the actions of the defendant clearly constituted state action, the court was not required to determine if the amendment applied to situations other than direct or governmentally sanctioned discrimination.

**9.** *But see* Comment, *A Review of the Implementation of the Pennsylvania Equal Rights Amendment*, 14 Duq.L.Rev. 683 (1976), wherein it is stated that the Pennsylvania ERA was an outgrowth of efforts by the Pittsburgh Chapter of the National Organization of Women.

**10.** Tex.Const. art. 1, § 3a: "Equality under the law shall not be denied or abridged because of sex, race color, creed, or national origin."

leagues for youths for refusing to permit her to play in the same league as male youngsters. In defining whether the restriction in the Texas amendment guaranteeing "equality under the law" was intended to regulate all activities within the jurisdiction or only those which carried the imprimatur of the state, the Texas Court of Appeals reasoned:

"Clearly 'under the law' covers all actions of governmental entities. However, we do not believe that applicability of the amendment is or should be limited to only those cases involving sex discrimination via a statute, ordinance, or official policy. We believe such a construction was unintended and is too narrow. However, at the other extreme is the broadest construction of the amendment, abolishment of all sex discrimination, public and private. Here 'under the law' is read in the most expansive context to enable the state the fullest use of its police power to socially engineer sex discrimination out of existence. This construction necessarily assumes that this state possesses the requisite police power to enforce such socialization of its citizens. We express no opinion on the validity of this assumption because we do not believe that 'under the law' should be so broadly construed.

We do not believe 'under the law' covers purely private conduct. We do not believe the Texas Era [sic] proscribes purely private sex discrimination. . . . We cannot believe that by enacting the amendment [the legislature and citizens] intended to have their private conduct regulated by the state. Private sex discrimination in many instances could be based upon what the individual perceives to be the proper role for men and women in society. Thus the private conduct could be considered an expression of the individual's social, moral, cultural, and religious beliefs. While reasonable minds can and do differ, and many are quite emotional on this subject, it is certainly not for this court to hold that such private conduct is illegal absent a clear expression of intent from the legislature and the citizens of this state.

Had the amendment been intended to proscribe private conduct, we believe this proscription could and would have been clearly expressed to apply to all discrimination, public and private. This the legislature and citizens of Texas did not do. Rather, they guaranteed equality 'under the law.' This indicates to us that they intended to adopt the policy of sexual equality in the area of government and public affairs.

In a brief opinion the court of civil appeals in *Junior Football Association of Orange v. Gaudet*, 546 S.W.2d 70 (Tex.Civ.App.—Beaumont 1976, no writ), construed 'under the law' under almost identical facts. It reversed the trial court's grant of a temporary injunction which would have allowed a young female to play football in a boy's league until the female reached puberty. The court construed 'under the law' as follows:

> 'The words "under the law" in the above article of the Texas Constitution require that the discrimination complained of is state action or private conduct that is encouraged by, enabled by, or closely interrelated in function with state action.'

We believe this construction of 'under the law' reaches an appropriate middle ground between extreme constructions of the amendment. It is our opinion that this construction most closely reflects the intent of the amendment. It guarantees equality in public affairs and in some cases when private conduct becomes so aligned with state function or involvement that it would be unreasonable to conclude that it is purely private discrimination. Yet, this construction does not have the courts and governmental agencies of this state dictating the private actions and relationships of its citizens which apparently reflect their fundamental beliefs. Far be it from this court to conclude that such beliefs are right or wrong."

*Id.* at 925 (emphasis in original).

Likewise, in *MacLean v. First Northwest Indus. of America, Inc.*, 24 Wash.App. 161, 600 P.2d 1027 (1979), the court held

that state action was a necessary prerequisite for a cause of action under the Washington ERA.[11]

Examining these cases and the reasoning therein, we conclude that the Pennsylvania equal rights amendment should be construed to apply to gender–based discrimination that emanates from the Commonwealth through its statutes, court rulings or official policies or through the egis of governmental action under the state action test, and does not prohibit actions that are solely private in nature. Indeed, both parties contend, and our research confirms, that not a single case has been decided in the courts of this Commonwealth in which private gender–based discrimination has been held to violate the equal rights amendment.[12]

11. Wash.Const. art. XXXI, § 1: "Equality of rights and responsibilities under the law shall not be denied or abridged on account of sex."

12. In several cases, courts in this Commonwealth have struck down legal presumptions created through court precedent when those presumptions were found to discriminate on the basis of sex. Thus, in *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977) the supreme court struck down the judicially fabricated presumption that a child of tender years is best suited to remain in the custody of the mother, and in *Butler v. Butler*, 464 Pa. 522, 347 A.2d 477 (1975), the court abolished the presumption which held that a husband who purchases property and places it in an entireties estate is deemed to have intended to give one–half of the estate as a gift, whereas a wife in similar circumstances is presumed not to have intended a gift but instead is deemed to have intended to create a resulting trust in her own behalf.

Although it may be argued that these cases involve discrimination of a private nature, such is not the case. Although invoked during a private cause of action, the offensive provisions had roots in the judicially created law of this Commonwealth. Thus, it is the source of the discriminatory provision that determines whether it arises "under the law" and not the context in which the provision is challenged. *See also DiFlorido v. DiFlorido*, 459 Pa. 641, 331 A.2d 174 (1975) (abolishing common law presumption that husband is the exclusive owner of household goods); *Hopkins v. Blanco*, 457 Pa. 90, 320 A.2d 139 (1974) (abrogating common law rule permitting husband but not wife to recover for consortium); *Conway v. Dana*, 456 Pa. 536, 318 A.2d 324 (1974) (eliminating presumption that father has primary burden to support minor children); *Rollman Estate*, 71 D. & C.2d 6 (C.P. Lanc. 1975) (abolishing rule that husband but not wife is primarily liable for funeral expenses of deceased spouse); *Albert Einstein Medical Center v. Gold*, 66 D. & C.2d 347 (C.P.Phila.1974) (abrogating rule that husband but not wife is responsible for necessities of spouse).

We believe that any further extension would serve only to impose upon the courts the task of regulating the day to day activities of the citizens of this Commonwealth and ultimately wrest from their control the conduct of their private affairs.  Indeed, we note that in *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 454 Pa. 193, 311 A.2d 588 (1973), Justice O'Brien, speaking for our supreme court, observed that the provisions in Article 1 of the Pennsylvania Constitution are only intended to be limits upon the actions of the state government.  In that case, the court noted that an exception to that rule existed in Article 1, § 27 which expressly invested in the Commonwealth the power to act as trustee to preserve the natural resources of the Commonwealth.  Thus, as is obvious through the language of article 1, § 27,[13] the legislature and the voters of this Commonwealth, when they so desire, may enact a provision reserving or creating rights where heretofore they did not exist.  Not having expressly created a right in either the Commonwealth as sovereign or the citizens themselves to eliminate sex discrimination that is non–governmental in nature, we believe that it would be an unwarranted expansion of the purpose of article 1 to judicially fabricate such a right in § 28 of that article.

If the Pennsylvania equal rights amendment only prohibits gender–based discrimination that is state related, for what purpose was that provision enacted in 1971?  We believe that the answer lies in the desire to effectuate a wholesale rather than a piecemeal change in those statutes which discriminate on the basis of sex,[14] to serve as a general

**13.**  Article 1, § 27 and § 28 were passed by the General Assembly and adopted by the voters of the Commonwealth at the same time.

**14.**  Aul & Trichorn *Pennsylvania Equal Rights Amendment Impact Report*, Vol. 127 Pittsburgh Legal Journal, No. 7, pp. 3 *et seq.* (1980) contains an excellent summary of the gradual efforts made by the various branches and agencies of the state government to modify those statutes and regulations that differentiated on the basis of gender to bring them into compliance with the ERA.  Without the ERA, total modification of all gender–based provisions probably would have been a piecemeal and perhaps not completely successful accomplishment.  With the ERA, the general policy against sex

policy statement prohibiting future enactment of gender–based legislation,[15] *see* Comment, *A Review of the Implementation of the Pennsylvania Equal Rights Amendment*, 14 Duq.L.Rev. 683, 685 (1976); Brown, Emerson, Falk & Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women*, 80 Yale L.J. 871, 875–84 (1971), and to extend beyond the then–evolving, but somewhat limited, protection afforded by the United States Supreme Court in its interpretation of the equal protection clause of the fourteenth amendment to the federal constitution.[16] Indeed, it has been in the latter instance in which the Pennsylvania ERA has had the greatest impact with the courts of this Commonwealth adopting a more stringent standard of

discrimination was established, thus permitting a careful and unhurried revision of those provisions that discriminated contrary to the provisions of the ERA.

15. *See Commonwealth v. National Gettysburg Battlefield Tower, Inc., supra* in which the supreme court in another context discussed the nature of a constitution as establishing guiding principles by which society and the various branches of government are to function:

" 'A constitution is primarily a declaration of principles of fundamental law. Its provisions are usually only commands to the legislature to enact laws to carry out the purpose of the framers of the Constitution, or mere restrictions upon the power of the legislature to pass laws....' " *Id.*, 454 Pa. at 198, 311 A.2d at 591, *quoting, O'Neill v. White*, 343 Pa. 96, 99, 22 A.2d 25, 26 (1941).

16. In May 1971, when the Pennsylvania ERA was adopted, the Supreme Court had not as yet invalidated any provision on the basis that it unfairly discriminated on the basis of sex. In October of that year the Court for the first time invalidated a sex–based classification through employment of the minimum scrutiny or rational relationship test. *See Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Two years later in *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), four Justices opined that sex, like race, alienage and national origin, should constitute a suspect class and that statutes discriminating on the basis of sex should be subject to a more restrictive analysis under the strict scrutiny test. Finally, in 1976 the Court established a middle level of scrutiny and held "that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976).

For a discussion of Pennsylvania's evolving standard, *see* note 17 *infra*.

scrutiny than existed in 1971.[17]   Thus, we do not believe that the Pennsylvania ERA is a meaningless shibboleth without form or substance.   Rather, it has served as an effective and positive tool for achieving equal treatment under the law for our citizens.[18]   Yet, it was not intended as an omnipotent force guiding and controlling every aspect of our day to day activities.[19]   As such, it prohibits discrimination that flows directly from the state or indirectly under the tests of state action, but does not control activities that are solely private in nature.   As such, it does not restrict the activity of appellee.[20]

The order of the trial court is affirmed.

**17.**   The exact standard employed in Pennsylvania has not been completely clarified.   In *Henderson v. Henderson*, 458 Pa. 97, 101, 327 A.2d 60, 62 (1974), the supreme court appeared to affirm an absolutist or literal approach in implementing the amendment and held that "[t]he sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities." *See also Hopkins v. Blanco, supra;   Conway v. Dana, supra.*

As at least one commentator has noted, however, even the absolutist approach must permit some exceptions.   Otherwise, carried to its extreme, it would prohibit segregation in restroom and sleeping facilities. *See* Comment, *A Review of the Implementation of the Pennsylvania Equal Rights Amendment*, 14 Duq.L.Rev. 683, 715–16 (1976).

In contrast, two cases, *Commonwealth v. Butler*, 458 Pa. 289, 328 A.2d 851 (1974) and *Percival v. City of Philadelphia*, 12 Pa.Cmwlth. 628, 317 A.2d 667 (1974), *vacated on other grounds*, 464 Pa. 308, 346 A.2d 754 (1975), implied that the standard in Pennsylvania was less than the absolutist approach, although an exact formula was not promulgated.

**18.** *See* note 11, *supra*.   A more extensive summary of changes in Pennsylvania and other jurisdictions with equal rights amendments may be found in Annot., 90 A.L.R.3d 158 (1979).

**19.**   We note, moreover, that our holding does not restrict the legislature from enacting provisions to eliminate private discrimination, and the most notable example is § 5 of the Pennsylvania Human Relations Act, Act of Oct. 27, 1955, P.L. 744, § 5, *as amended*, 43 P.S. § 955, which forbids any employer of four or more persons within the Commonwealth from discriminating on the basis of race, color, religious creed, ancestry, age, *sex*, national origin or . . . handicap. . . ." (emphasis added).

**20.**   Despite our ruling, appellant is not without a remedy since the Casualty and Surety Rate Regulatory Act, Act of June 11, 1947,

*supra*, § 5, 40 P.S. § 1185(b) permits an aggrieved consumer to file a complaint with the Commissioner of Insurance alleging that a rate is not in conformity with the provisions of that act. Indeed, at least one consumer has been successful in pursuing that remedy on the basis of alleged sex discrimination. *See Philip Mattes, III, v. Hartford Accident and Indemnity Co.*, Docket No. 78–72 (complaint before the Insurance Commissioner).