Hartford Accident and Indemnity Company, Petitioner *v.* Insurance Commissioner of the Commonwealth of Pennsylvania, Respondent. Philip V. Mattes, et al., Intervenors.

President Judge CRUMLISH, JR. filed a dissenting opinion which was substantially as follows:

1. Because insurance is an evolved plan with risk distribution as its primary characteristic, insurance companies must be able to rely on actuarial integrity in establishing rates. [259]

Argued December 15, 1981, before President Judge CRUMLISH, JR. and Judges MENCER, ROGERS, WILLIAMS, JR. and CRAIG.

*Fred Speaker,* with him *John G. Harkins, Jr., Marjorie G. Marinoff* and *Julia A. Conover, Pepper, Hamilton & Scheetz,* of counsel, *Harold M. Levy,* for petitioner.

*Hannah Leavitt,* Assistant Counsel, with her *Anthony A. Geyelin,* Chief Counsel, and *Allen C. Warshaw,* Deputy Attorney General, for respondents.

*Philip V. Mattes, Mattes, Mattes & Mattes, P.C.,* for intervenor, Philip V. Mattes.

*Jane D. Elliott,* with her *James J. McCabe,* and *Judith K. Mintel,* Senior Attorney, and *Mark T. Carroll, Duane, Morris & Heckscher,* for intervenor, State Farm.

*James D. Crawford, Schnader, Harrison, Segal & Lewis,* with him *William L. Martin,* Senior Vice President and General Counsel, for Amicus Curiae American Insurance Association.

*Rita L. Bernstein,* with her *Susan Cary Nicholas, Phyllis N. Segal,* and *Judith I. Avner,* for Amici Curiae, Women's Law Project and NOW Legal Defense and Education Fund.

*Walter R. Milbourne,* with him *James W. Christie,* of counsel: *Obermayer, Rebmann, Maxwell & Hippel,* for Amicus Curiae, The Insurance Federation of Pennsylvania, Inc.

*Jeffrey B. Clay,* with him *Eric L. Brossman* and *David E. Lehman, McNees,. Wallace & Nurick,* for Amicus Curiae, Nationwide Mutual Insurance Company, Nationwide General Insurance Company, and Nationwide Mutual Fire Insurance Company.

OPINION BY JUDGE CRAIG, March 10, 1982:

We are required to decide if the Insurance Commissioner exceeded his statutory authority in disapproving the use of sex as a classification basis for automobile insurance rate differentials, under the Casualty and Surety Rate Regulatory Act of 1947 (Rate Act), Act of June 11, 1947, P.L. 538, 40 P.S. §§1181-1199.[1]

After the Insurance Department had earlier approved a rate classification plan filed on behalf of Hartford Accident and Indemnity Company, Philip V. Mattes, the intervening appellee here, filed a complaint under Section 5(b) of the Rate Act, 40 P.S. §1185(b), questioning the validity of charging him, a 26-year old male, a $360 premium, while charging a female $212, with no difference other than gender being involved. Mattes' position was that the sex-based distinction violates his rights under the laws and the Constitution of the Commonwealth, as well as under the United States Constitution.

Following the receipt of evidence by a hearing examiner, Insurance Commissioner Harvey Bartle issued an order disapproving Hartford's rating plan, with an effective date of April 17, 1981, later extended to April 17, 1982. The Commissioner's adjudication followed Section 3 of the Rate Act, 40 P.S. §1183, in noting that, under subsection 3(a), due consideration must be given, not only to various actuarial and underwriting factors, but also to "all other relevant factors within

---

[1] In addition to the thorough briefs filed on behalf of the original and intervening parties, we have had the benefit of equally thorough briefs of amici curiae, Women's Law Project, NOW Legal Defense and Education Fund, American Insurance Association, Insurance Federation of Pennsylvania, and Nationwide Insurance Companies. Because of our disposition of the case, we do not reach the consititutional questions raised by Complainant Mattes and covered, *inter alia*, by the briefs of amici.

and outside the Commonwealth;"[2] that risks may be grouped by classification for premium determinations, subsection 3(c); and that, under subsection 3(d), rates "shall not be excessive, inadequate or unfairly discriminatory." Although the Commissioner declined to base his decision on constitutional grounds because he regarded judicial precedents as indicating that Pennsylvania's rate system does not constitute sufficient state action to be subject to the self-executing governance of the Fourteenth Amendment or of the Pennsylvania Constitution, art. I, §28 (Pennsylvania's ERA), his adjudication did look to ERA as an aid in interpreting his powers and duties under the Rate Act. Accordingly, considering Hartford's own evidence that there are no inherent differences between the driving ability of men and women, and that Hartford's ratemaking was derived from loss experience differentials based upon the sex of persons listed in policies as "principal operator" rather than upon statistics using the gender of drivers actually involved in accidents, the Commissioner's adjudication, without being limited to purely actuarial considerations, concluded that "continued sexual discrimination in automobile in-

---

[2] The full wording of subsection (a) is:

All rates shall be made in accordance with the following provisions:

(a) Due consideration shall be given to past and prospective loss experience within and outside this Commonwealth, to physical hazards, to safety and loss prevention factors, to underwriting practice and judgment to the extent appropriate, to catastrophe hazards, if any, to a reasonable margin for underwriting profit and contingencies, to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers, to past and prospective expenses both country wide and those specially applicable to this Commonwealth, and to all other relevant factors within and outside this Commonwealth.

surance rates violates §§1 and 3(d) of the Rate Act," and that "[m]ales and females, in otherwise similar circumstances, cannot be charged different rates because of their gender." His order, however, was limited to the disapproval of Hartford's rating plan, "insofar as it contains sexual classifications...."

The Commissioner's adjudication relied in part on this court's decision in *Capital Blue Cross v. Insurance Department*, 34 Pa. Commonwealth Ct. 584, 383 A.2d 1306 (1978) where, even though the actuarial soundness of a hospitalization insurance rate filing was stipulated and therefore undisputed, we upheld the Commissioner's disapproval on the basis of the absence of a community rating factor which would have had the effect of lowering cost for the elderly. We declined to interfere with the Commissioner's disapproval of that rate filing because we perceived that there had not been any illegal or capricious administrative determination lacking substantial evidence to support it. 34 Pa. Commonwealth Ct. at 588, 383 A.2d at 1308.

Notably, in that case we upheld the determination that the rate filing was "inequitable" on a basis much more general than the one present here, where the sex-based distinction has been found to be "unfairly discriminatory" in the words of the Rate Act construed against the background of the Pennsylvania ERA. That provision of the Pennsylvania Constitution must be viewed as a powerful influence in statutory construction, as the Pennsylvania Supreme Court did in *George v. George*, 487 Pa. 133, 409 A.2d 1 (1980), where the statute governing divorce from bed and board was read as providing for reciprocity of remedies for spouses, in the light of the ERA's existence. *George* pointed back to *Henderson v. Henderson*, 458 Pa. 97, 327 A.2d 60 (1974) where, holding that it would be unconstitutional to confine the statutory right of alimony pendente lite only to wives, the Supreme Court stated per curiam:

> The thrust of the Equal Rights Amendment is to insure equality of rights under the law and to eliminate sex as a basis for distinction. The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities. The law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman.

458 Pa. at 101, 327 A.2d at 62. *Henderson*, along with *DiFlorido v. DiFlorido*, 459 Pa. 641, 331 A.2d 174 (1975) (abolishing the presumption that the husband is the provider), *Commonwealth v. Butler*, 458 Pa. 522, 328 A.2d 851 (1974) (invalidating criminal law sentencing distinctions as to women), and *Conway v. Dana*, 456 Pa. 536, 318 A.2d 324 (1974) (abolishing the presumption of the father's liability for child support) thus confirms the great weight which the Supreme Court has ascribed to the unqualified terms of the Pennsylvania ERA, which reads:

> Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual. Pa. Const. art. I, §28.

Although the foregoing case clearly involved "state action," we agree with the Commissioner that there is here no necessity for categorizing insurance companies' functions or the rate system or the Commissioner's action as state action, in order to strike down the gender classification as unconstitutional, because we are not presently called upon to determine whether or not there is an abiding unconstitutionality in the rate filing itself, but only whether the Commissioner exceeded his statutory authority in his affirmative application of its express prohibition of "unfairly discriminatory" rates as the basis for his administrative proscription of sex as a factor.

The foregoing line of Pennsylvania Supreme Court cases at the least makes clear that the force of the Pennsylvania ERA is not confined to the matter of individual "rights" in the sense of entitlements, but equally extends to elimination of discrimination with respect to burdens and obligations "under the law."

In this case, the Commissioner's positive exercise of his authority under the statute, to disapprove rating schemes, is the key distinction between the present situation and that faced by the Pennsylvania Superior Court in *Murphy v. Harleysville Mutual Insurance Co.*, 282 Pa. Superior Ct. 244, 422 A.2d 1097 (1980), which concluded that no state action was involved and therefore dismissed a suit seeking to invalidate sex-based automobile insurance rate classification as unconstitutional under the Pennsylvania ERA, absent any exercise by the Commissioner of his statutory authority. Moreover, in *Murphy*, the Pennsylvania Superior Court was given no opportunity to consider, apart from the question of state action, whether or not there is here an issue involving relative burdens "under the law" by virtue of the provisions of the Pennsylvania No-Fault Act, Act of July 19, 1974, P.L. 489, 40 P.S. §§1009.102-1009.701, making automobile insurance a compulsory prerequisite to the operation of an automobile. Even though the operation of an automobile be a privilege, instead of a right, the Insurance Commissioner was correct in recognizing that the policy concern of the ERA can extend to a privilege, as we saw it in *Commonwealth v. Pennsylvania Interscholastic Athletic Assoc.*, 18 Pa. Commonwealth Ct. 45, 334 A.2d 839 (1975) where we found that it was effective to prohibit the exclusion of females from athletics even though "[t]here is no fundamental right to engage in interscholastic sports...." 18 Pa. Commonwealth Ct. at 51, 334 A.2d at 842.

*Capital Blue Cross*, by holding that actuarial soundness cannot be the sole test of validity of a rate,

established that actuarial justification does not operate without limit.[3]

*Insurance Department v. Philadelphia*, 196 Pa. Superior Ct. 221, 173 A.2d 811 (1961), upholding Insurance Commissioner approval of a higher territorial rate for Philadelphia as to fire insurance, does not stand for any contrary proposition by virtue of the dictum therein, that continuation of the old rates favoring Philadelphia could have violated an "unfairly discriminatory" standard. The principal thrust of that case was to affirm the Commissioner's exercise of discretion under the statute there involved as we noted in *Capital Blue Cross*, 34 Pa. Commonwealth Ct. at 590, 383 A.2d at 1309, by quoting the Superior Court's statement that the courts " 'must recognize the value of the judgment of an Insurance Commissioner who is specializing in the field of insurance'....196 Pa. Superior Ct. at 237-38, 173 A.2d at 819." That comment has clear significance here, where the Commissioner found that his disapproval of gender as a factor was consistent with the evidence before him. In the face of the admission, by Hartford's expert, that men are not inherently worse drivers than women, the Commissioner noted that the male gender classification was being employed by Hartford as a proxy for (1) the class of those who tend to drive more while under the influence of alcohol and (2) the class of those who drive more during rush hour periods of the day. As the Commissioner said, although more men may drive

---

[3] The Commissioner's adjudication here suggested that, even if we assumed the existence of a purely actuarial basis for insurance rate classification based upon racial or nationality groupings, the statistical justification would not suffice legally. Although race and nationality categorizations have the special status of being suspect classifications, and the according of such status to gender remains in dispute, the point illustrates that actuarial justification cannot be regarded as unlimited.

while drinking and more men may drive during rush hour, nevertheless—

> Why should not the risk be spread equally among all males and females in otherwise like circumstances, since admittedly some females also drive while inebriated as well as in heavy traffic?

Indeed, the essential nature of the matter under review is that the Commissioner has exercised his legislatively conferred function of evaluating the rating system by which risks are spread.

Hartford, as its second major issue, argues that the Commissioner exceeded his statutory authority because a regulation, 31 Pa. Code §145.1, provides, in connection with the implementation of the Unfair Insurance Practices Act (UIPA), Act of July 22, 1974, P.L. 589, 40 P.S. §§1171.1-1171.15, that unfair sex discrimination in terms or conditions of insurance is prohibited, but adds:

> This Chapter does not prohibit insurers from differentiating in premiums rates between sexes where there is sound actuarial justification.

However, it is clear that the UIPA, and therefore the above regulation which implements it, are distinct and apart from the ratemaking process covered by the Rate Act because the UIPA is intended "to regulate trade practices," 40 P.S. §1171.2, in that its relationship to "underwriting standards and practices" is expressly stated as not including the promulgation of rates under the Rate Act, 40 P.S. §1171.5(a)(7)(iii). In such context, the regulation, as its words indicate, is not an authorization to use sex classification based on actuarial justification, but is phrased merely as not being a prohibition because it does not deal with that subject matter.

The Commissioner's expertise is also important in providing reassurance against Hartford's claim that

dire results will ensue from the Commissioner's determination, such as the consequence that females will be unfairly subsidizing males, a claim met by the Commissioner's comment that some males presently subsidize other males and some females presently subsidize other females. Any prospect that insurance companies might cease to write insurance for males must face not only the practicalities of the market but, as the Commissioner noted, the constraints of the UIPA.

In summary, the courts are not in a position to dispute the Commissioner's conclusion that, "the use of sex as a rating classification is not a necessary pillar to the automobile insurance system."

For these reasons, we decide that the Commissioner did not exceed his statutory authority but instead considered the actuarial factors and also, as required by Section 3(a) "all other relevant factors within and outside the Commonwealth," in determining that the sex-based auto insurance rate classification was "inherently unfairly discriminatory" because it failed to treat "equals equally."

### ORDER

Now, March 10, 1982, the order of the Insurance Commissioner at his Docket No. R78-7-2, dated April 17, 1980, is affirmed.

Judge PALLADINO did not participate in the decision in this case.

---

DISSENTING OPINION BY PRESIDENT JUDGE CRUMLISH, JR.:

Today's majority decision unduly extends the Insurance Commissioner's authority. The Commissioner is now given judicial imprimatur to impress his social theory upon the insurance rate review process.

It is axiomatic that insurance is an evolved plan with risk distribution as its primary characteristic.

Moreover, to make insurance a feasible means of providing maximum benefit for the least amount of money, the insurers must have sufficient knowledge of past events to be able to determine the probability of certain risks occurring. Since insurance is based on this risk probability, the insurance companies must be able to rely on actuarial integrity in establishing rates.

The Legislature recognized the importance of predictability and objectivity in the rate-making process. Section 3(a) of the Rate Act enumerates several factors, all of which can be analyzed with a high degree of objectivity, that the Commissioner must consider in reviewing rate proposals. Although the Commissioner is given the authority to consider "all other relevant factors within and outside the Commonwealth," the Legislature must have meant *all other factors which can be subject to the same degree of objective scrutiny*.

The majority decision implicitly authorizes the Commissioner to inject his own philosophical views into the rate review process; even though the source of these views (and consequently the views themselves) may change at least as often as the Commonwealth's executive branch of government. Our late President Judge BOWMAN, dissenting in *Capital Blue Cross v. Insurance Department*, 34 Pa. Commonwealth Ct. 584, 593, 383 A.2d 1306, 1311 (1978) (dissent), noted the danger of permitting the Commissioner to dictate the application of an appealing, or even socially popular, socioeconomic theory upon the insurance rate approval process. Although there I had joined the majority, upon reflection, I now realize that my position in *Capital Blue Cross* was not the most enlightened one.

I concur with the majority that due deference must be given to the Commissioner's judgment. He is presumed to be a specialist in the insurance field (although not conclusively so merely because of his

office). This Commissioner, however, has strayed beyond the bounds of the insurance field and into the sphere of policy determination, an area properly reserved to the *elected* body. If it were determined that the proposed rates were actuarily unsound or in some other manner clearly illegal, I would join in disapproving such a scheme. This determination, however, cannot be made on the present record. I agree with President Judge BOWMAN's observation that the majority decision "assumes that the Commissioner enjoys omnipotence superior to all, that a particular socioeconomic theory is valid and not subject to opinion difference," *Capital Blue Cross,* 34 Pa. Commonwealth Ct. at 594, 383 A.2d at 1311, and hence I would remand for more actuarial evidence against which to examine the Commissioner's judgment.