Green et al. *v.* Milk Control Commission et al.,
Appellants.

Argued October 1, 1940. Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

(1)

*Frank E. Coho,* Deputy Attorney General, with him *Claude T. Reno,* Attorney General, for appellants.

*Willis F. Daniels,* with him *Harold W. Swope* and *Elmer E. Harter,* for appellees.

*E. Lowry Humes,* for interested party, under Rule 61.

*A. Evans Kephart,* for interested party, under Rule 61.

OPINION BY MR. CHIEF JUSTICE SCHAFFER, October 28, 1940:

The Commonwealth, whose appeal this is, states as the controlling question involved: Does the Milk Control Law of April 28, 1937, P. L. 417, 31 PS Sec. 700j-101 et seq., vest in the Milk Control Commission power and authority to fix the minimum rates at which milk producers must be paid by milk dealers for milk shipped to the dealers on consignment for utilization and sale by the dealers and to require the milk dealers to post bonds for the protection of the producers? If the answer is in the negative all the other questions stated are erased.

In an elaborate opinion by the very able President Judge of the court below,* with which one of his associates disagreed, all the controverted issues were most fully discussed. We think it not necessary that we shall

---

* 48 Dauphin County Reports 385.

treat even the main one in such detail; the decree entered might well be affirmed on the opinion of the President Judge.

The principle guiding to decision is this: The power and authority to be exercised by administrative commissions must be conferred by legislative language clear and unmistakable. A doubtful power does not exist. Such tribunals are extra judicial. They should act within the strict and exact limits defined: *Citizens Passenger Ry. Co. v. Public Service Com.,* 271 Pa. 39, 114 A. 642; *Swarthmore Borough v. Public Service Com.,* 277 Pa. 472, 121 A. 488; *Blue Mountain Cons. Water Co. v. Public Service Com.,* 125 Pa. Superior Ct. 1, 189 A. 545; *State Board of Milk Control v. Richman Ice Cream Co.,* 117 N. J. Equity 296, 175 A. 796. With the principle stated before us, turning to the law embodying the powers of the Milk Control Commission, we find nothing said about milk shipped to dealers on consignment. It speaks of the "purchase" of milk by dealers, its "delivery and sale" to them; it uses the words "buy," "purchase," "prices," "bought or sold," "sell or buy." The words "consign" or "consignment" nowhere appear. We are asked by the Commonwealth to interpolate these words into the Act. This we cannot do without violating the important principle to which we have adverted. If the legislature desires to change the law, this can shortly be demonstrated by an amendment at the coming session, writing into the Act a provision covering milk sent to dealers on consignment.

This bill in equity was sustained by the court below simply to restrain the Commission and the Attorney General from proceeding, criminally or civilly, against plaintiff milk dealers because of consignment contracts entered into by them with producers of milk, and from demanding that plaintiffs comply with the bonding and price-fixing provisions of the law, except by hearings before the Commission. Nothing prevents the Commission from proceeding to an inquiry and determination

whether, as argued, the consignment contracts are mere subterfuges and are in reality contracts of sale. If they are, then, of course, they are within the sweep of the law.

Decree affirmed at appellant's cost.

DISSENTING OPINION BY MR. JUSTICE STERN:

The normal course of the milk business, in the State of Pennsylvania as elsewhere, has been for producers, or a coöperative association on their behalf, to sell to dealers, and for the dealers in turn to sell to consumers. A dealer is defined in the Milk Control Law as a person who purchases or handles milk within the Commonwealth, for sale, shipment, storage, processing or manufacture. A consumer is defined as any person, other than a milk dealer, who purchases milk for consumption or use.

Plaintiffs are a handful of dealers who have contrived an ingenious scheme by which, although for all practical purposes transactions in the business are carried on as before, a new relationship, from a legalistic standpoint, is imposed upon the contracting parties. Instead of producers selling to dealers and the latter in turn to consumers, a form of agreement between producers and dealers has now been prepared whereby the dealer calls himself a "factor," the milk is said to be "consigned" to the "factor," the title is to remain in the producer until the milk is sold "whereupon it shall pass directly from producer to the person purchasing same," the "factor" is to be allowed to mix the milk of any producer with that of any and all other producers, and he is to "collect for and on behalf of the producers for all milk so sold, and guarantees to pay producers for all milk sold, if the purchasers shall fail to do so." From the proceeds of the milk the "factor" is to remit to the producer an amount stipulated in the agreement for each hundred pounds of milk of a prescribed butterfat content, the remainder to be retained by the "factor" as the latter's "compensation."

The obvious purpose of this device is to enable the plaintiffs to obtain milk from producers at prices lower than those fixed by the Milk Control Commission. If they succeed in this attempt the force of competition will naturally compel the entire industry to adopt the same arrangement, so that price-fixing by the Commission will become a nullity, the Milk Control Law will be effectively torpedoed, and the industry will be reduced to the condition which the act was designed to remedy. Of course, as the majority opinion points out, if the court has no alternative but to construe the statute as permitting this evasion, the situation can be corrected only by the legislature. But, in my opinion, a proper interpretation of the act leads to the contrary conclusion.

The Milk Control Law is different in theory and purpose from legislation regulating the rates of public utilities; there the object is to protect the consumer against excessive charges for service rendered. It is true that the Milk Control Law authorizes the fixing of maximum prices, and in this respect it also is intended for the benefit of the consumer. Its paramount purpose, however, is, by the fixing of *minimum* prices, to protect the producer against economic forces which might compel him to accept inadequate prices for the milk sold by him.[1] It is not that the producer is the real object of the Commonwealth's concern, but that he may thus be enabled to comply with the sanitary requirements vital for insuring the delivery of pure and wholesome milk to the consuming public. The act is not primarily aimed at *what the dealer or consumer shall pay, but what the producer shall receive.* Its preamble states that "Milk consumers are not assured of a constant and sufficient

---

[1] In the classical opinion rendered by President Judge KELLER on the Milk Control Law, which was adopted and affirmed by this court in *Rohrer v. Milk Control Board,* 322 Pa. 257, 186 A. 336, the reasons are graphically pointed out (page 265) why the producers would be largely at the mercy of the dealers were it not for the protection afforded by legislative intervention.

supply of pure, wholesome milk unless the high cost of maintaining sanitary conditions of production and standards of purity is returned to the producers of milk. . . . Public health is menaced when milk dealers do not or cannot pay a price to producers commensurate with the cost of sanitary production. . . . It is necessary to preserve and promote the strength and vigor of the inhabitants of this Commonwealth, to protect the public health and welfare, and to prevent fraud and imposition upon consumers and producers by continuing to treat the production, transportation, manufacture, processing, storage, distribution, and sale of milk in the Commonwealth of Pennsylvania as a business affecting the public health and affected with a public interest." Accepting these statements as at least prima facie true, and realizing therefrom the grave importance of the subject-matter of this legislation, it is clear that the act ought to be liberally construed in order to effectuate the legislative purpose of its enactment.

Before considering the exact question involved, it must be noted that the scope of the Milk Control Law is extremely comprehensive. It sets up a complete system of regulation and control of the industry. In the most sweeping language it vests the Commission "with power to supervise, investigate and regulate the entire milk industry of this Commonwealth, including the production, transportation, disposal, manufacture, processing, storage, distribution, delivery and sale of milk and milk products in this Commonwealth, and including the establishment of reasonable trade practices, systems of production control and marketing area committees in connection therewith," and it contains the further provision that "The operation and effect of any provision of this act conferring a general power upon the commission shall not be impaired or qualified by the granting to the commission by this act of a specific power or powers."

Even taken at its face value as a "consignment" contract between producer and dealer this new form of

agreement also involves *sales* by the producer to those purchasing through the "factor." Whether the purchasers be regarded as dealers or consumers, the prices paid in such sales are subject to regulation and control by the Commission since, by section 802 of the act, the latter is given the power to fix all prices, wholesale and retail, for the sale of milk.[2]  The Commission can, therefore, prescribe the actual amount to be received by the producer on all sales consummated through the "factor." It can further provide that the amount thus fixed shall not be reduced by anyone intercepting it, in whole or in part, before it reaches the producer. This is essential if the act is to have any meaning or effect whatever. When the Milk Control Law gives the Commission the power to fix prices it clearly covers the *net* prices to be received by the producer. Indeed, it expressly provides in section 807 that *"No method or device shall be lawful whereby milk is bought or sold, or offered to be bought or sold, at a price less than the minimum price applicable to the particular transaction,* whether by any discount, premium, rebate, free service, advertising allowance, or extension of credit, or by a combined price for such milk, together with another commodity or a service which is less, or is represented to be less, than the aggregate of the price of the milk and the price or value of such commodity or service when sold or offered for sale separately or otherwise." And in section 809, in dealing with the subject of "coöperatives," it is provided that "No milk dealers, or agents thereof, shall receive from any producer or from such coöperative association or corporation, directly or indirectly, any discounts, rebates, free service, or compensation through

---

[2] Also section 801 provides that the Commission "shall ascertain and maintain such prices for milk in the respective milk marketing areas as will be most beneficial to the public interest, best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the Commonwealth, having special regard to the health and welfare of children residing therein."

rentals, extension of credit, or otherwise for the purpose, or with the effect, of reducing the net cost to the dealer for milk purchased by or through such coöperative association or corporation." While the act does not attempt to control the business expenses of the producer, it does seek to insure his actually receiving the proceeds of his sales in the amounts or prices fixed by the Commission, and it gives to the latter the power to insist that those proceeds shall not be diminished, in the course of the sale transactions, by any method of diversion whatever.

There is another angle from which this question may be approached, and which leads to the same conclusion. The majority opinion stresses the fact that the Milk Control Law uses only the words "buy," "purchase," "prices," etc.; from this it is argued that consignment transactions are not within the purview of the act. It has already been pointed out that these "consignment" agreements necessarily involve also *sales* somewhere down the line, and that the Commission is empowered to fix the minimum price to be charged in such sales and to prevent the price thus fixed from being undermined by the device of paying commissions to so-called "factors" or by any similar scheme. But there is high authority even for the broader proposition that the "consignment" phase of the transaction is itself directly subject to the power of the Commission irrespective of any subsequent sales of milk by the "factor." In *United States v. Rock Royal Co-operative, Inc.*, 307 U. S. 533, 579, 580, the Court construed the word "purchased" in the Agricultural Marketing Agreement Act of 1937 as being not confined merely to technical "sales," but as having the more general meaning of "acquired for marketing." So, here, since the act defines a dealer not only as one who "purchases" but also one who "handles" milk, the power to fix "prices" as between producer and dealer properly includes the power to regulate the terms of transactions by which the milk is merely "acquired" by the dealer "for marketing," or, in other words, "consigned," instead

of being "bought" outright by him, and particularly to prescribe the amount of commissions, if any, to be allowed in such cases.

Having regard, then, to the fundamental purpose of the Milk Control Law and the necessity of judicially implementing its provisions for the welfare of the people of the Commonwealth, especially the children, the act, in my opinion, should not be emasculated by unduly technical construction. I think it clearly gives the Milk Control Commission the power to regulate consignments as well as sales by producer to dealer, and where there is a sale, as in the proposed form of agreement, from the producer to an ultimate purchaser, to fix the net prices to be received by the former in such transactions after the deduction of any and all commissions for agents or others who seek to intercept the receipt of the proceeds by the producer.

I see no reason for the issuance by the court below of an injunction in this case, nor, on the other hand, as the situation now stands, for the institution of any criminal proceedings. It would seem in order for the Commission, in view of these proposed "consignment" contracts, to fix the prices to be paid and received for sales thereunder over and above any amount that may be paid thereout to "factors," and then to enforce the order thus made by such proceedings as may be necessary. It follows too, from what has been said, that the provision in regard to the furnishing of bonds should be held to apply also to the form of transaction here under consideration.

Mr. Justice PATTERSON joins in this dissent.