482 A.2d 542

HARTFORD ACCIDENT AND INDEMNITY COMPANY

v.

INSURANCE COMMISSIONER OF the COMMONWEALTH of Pennsylvania,

Philip V. Mattes and State Farm Mutual Automobile Insurance Company, Intervenors.

Appeal of HARTFORD ACCIDENT AND INDEMNITY COMPANY and State Farm Mutual Automobile Insurance Company.

Supreme Court of Pennsylvania.

Argued Oct. 20, 1983.

Reargued April 10, 1984.

Decided Sept. 27, 1984.

572

John G. Harkins, Philadelphia, Fred Speaker, Harrisburg, for Hartford.

Marjorie E. Greenfield, Jane D. Elliott, James J. McCabe, Philadelphia, for State Farm.

Hannah Leavitt, Harrisburg, for Dept. of Ins.

Philip V. Mattes, Stroudsburg, for Mattes, et al.

Rita L. Bernstein, Philadelphia, for amici, Women's Law Project, et al.

James D. Crawford, Philadelphia, for amicus, American Ins. Assoc.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

In this appeal we have agreed to review the Commonwealth Court's affirmance of an order of the Insurance Commissioner of Pennsylvania ("Commissioner") rescinding his prior approval of Hartford Accident and Indemnity Company's ("Hartford") gender-based automobile insurance rates on the ground they were "unfairly discriminatory" under section 3(d) of the Casualty and Surety Rate Regulation Act ("Rate Act"), Act of June 11, 1947, P.L. 538, § 3(d), 40 P.S. § 1183(d)(1971). After careful consideration we have concluded that the Commissioner's action was both within his statutory authority and mandated by the Rate Act, and, therefore, affirm.

### I.

The instant action was initiated by Philip V. Mattes ("Mattes"), a Hartford automobile policyholder, who filed a complaint with the Commissioner challenging the legality of the Commissioner's earlier approval of Hartford's gender-based rates. Mattes established at an evidentiary hearing that, as a twenty-six year old unmarried male with an unblemished driving record, he was obligated to pay One Hundred Forty-eight Dollars ($148) more in annual premiums than would a similarly situated female insured for identical coverage. Hartford sought to justify its rating plan on the ground that actuarial data indicated that male policyholders in Mattes' age group are more likely to incur accident losses than female policyholders in the same age group.[1] The Commissioner, interpreting the Rate Act's prohibition of "unfairly discriminatory" rates in light of this Commonwealth's public policy against sex discrimination as embodied in the Equal Rights Amendment, concluded that

---

1. The statistics relied upon by Hartford did not reflect whether the policyholder was the actual operator of the vehicle involved in a given accident. While Hartford also offered accident statistics complied by the Pennsylvania Department of Transportation in support of the rate plan, that data had not been employed in the ratemaking process.

Hartford's gender-based rates were "unfairly discriminatory" and therefore invalid.

Hartford filed a petition for review of the Commissioner's adjudication in the Commonwealth Court; Mattes and the State Farm Mutual Automobile Insurance Company ("State Farm") were permitted to intervene. The Commonwealth Court affirmed *en banc,* finding no basis for disturbing the Commissioner's decision.[2]  65 Pa.Commw. 249, 442 A.2d 382 (1982). Petitions for allowance of appeal filed in this Court by Hartford and State Farm were granted.

## II.

In order to place Mattes' complaint and the Commissioner's response thereto in their proper context, an understanding of the statutory scheme which forms the background of this controversy is essential. The legislature's purpose in enacting the Rate Act is clearly set forth in section one:

> The purpose of this Act is *to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory;* to enable authorized insurers to meet all requirements of the insuring public of this Commonwealth, and to authorize and regulate cooperative action among insurers in rate making and in other matters within the scope of this Act. Nothing in this Act is intended (1) to prohibit or discourage reasonable competition, or (2) to prohibit or encourage uniformity in insurance rates, rating systems, rating plans or practices. *This Act shall be liberally interpreted to carry into effect its purposes as herein set forth.*

40 P.S. § 1181 (1971) (emphasis supplied).

The Rate Act applies, with certain enumerated exceptions, to "all classes and kinds of insurance which may be written by stock or mutual casualty insurance companies, associations or exchanges, and including fidelity, surety and guaranty bonds and all other forms of motor vehicle insurance,

2. President Judge Crumlish filed a dissenting opinion.

and to title insurance on risks or operations in this Commonwealth ...." 40 P.S. § 1182 (1971).

The central provision of the Rate Act is section three, which sets forth the manner in which insurers must formulate their rates, thereby creating an affirmative duty of compliance on the part of insurers wishing to do business in this Commonwealth:

All rates shall be made in accordance with the following provisions:

(a) Due consideration shall be given to past and prospective loss experience within and outside this Commonwealth, to physical hazards, to safety and loss prevention factors, to underwriting practice and judgment to the extent appropriate, to catastrophe hazards, if any, to a reasonable margin for underwriting profit and contingencies, to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers, to past and prospective expenses both country wide and those specially applicable to this Commonwealth, and to all other relevant factors within and outside this Commonwealth;

(b) The systems of expense provisions included in the rates for use by any insurer or group of insurers may differ from those of other insurers or groups of insurers to reflect the requirements of the operating methods of any such insurer or group with respect to any kind of insurance, or with respect to any subdivision or combination thereof for which subdivision or combination separate expense provisions are applicable;

(c) Risks may be grouped by classifications for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses;

(d) *Rates shall not be excessive, inadequate or unfairly discriminatory.*

40 P.S. § 1183 (1971) (emphasis supplied).

■ It must be emphasized that subsection (d) of section three limits the powers conferred upon insurance companies under subsections (a), (b) and (c). The overriding consideration is section three's mandate that, rates may not be "excessive, inadequate or unfairly discriminatory."

To ensure compliance with the above provisions, section four of the Act requires every insurer to "file with the Commissioner every manual of classifications, rules, and rates, every rating plan and every modification of any of the foregoing which it proposes to use." 40 P.S. § 1184(a) (1971).[3] The Commissioner must "review such of the filings as it may be necessary to carry out the purposes of this Act," 40 P.S. § 1184(c) (1971), and is empowered to disapprove, after a hearing, any filing which fails to meet the requirements of the Rate Act. 40 P.S. § 1185 (1971). Beyond this specific delegation of authority, the legislature has committed to the Commissioner the "full power and authority, ... [and] duty, to enforce by regulations, orders, or otherwise, ... the provisions of this Act, *and the full intent thereof."* 40 P.S. § 1193(d) (1971) (emphasis supplied).

■ Persons aggrieved by an approved filing which has not taken effect are entitled to file a complaint with and have a hearing before the Commissioner. 40 P.S. § 1197(a) (1971); *Commonwealth, Insurance Department v. Adrid,* 24 Pa.Commw. 270, 355 A.2d 597 (1976). Administrative review is available in appropriate cases even where, as in the instant case, the challenged filing is in effect.[4] More-

3. This obligation may be satisfied through the medium of a licensed rating organization. Act of June 11, 1947, P.L. 538, § 4(b), 40 P.S. § 1184(b) (1971). Hartford is a member of such an organization.

4. Any person or organization aggrieved with respect to any filing which is in effect may make written application to the Commissioner for a hearing thereon: .... Such application shall specify the grounds to be relied upon by the applicant. If the Commissioner

over, a party adversely affected by the Commissioner's adjudication of a complaint has a right of appeal to the Commonwealth Court. 40 P.S. § 1197(c) (Supp.1983–84); 42 Pa.C.S. § 763(a).

■ Several important points emerge from the foregoing discussion. The Rate Act evidences the clear legislative determination that the public welfare requires both statutory channeling of the ratemaking process and administrative scrutiny of the resulting rates. One of the principal justifications for governmental involvement identified by the legislature is the need to prevent "unfairly discriminatory" rates. To achieve that goal, the legislature has directly prohibited insurers from making "unfairly discriminatory" rates, and has entrusted enforcement of that prohibition to the Commissioner, and, if need be, to the courts. Thus the Rate Act, independent of any federal or state constitutional provision, proscribes "unfairly discriminatory" ratemaking by insurers in this Commonwealth and provides administrative and judicial remedies therefor.

## III.

The basic issue in this appeal is the proper interpretation of the phrase "unfairly discriminatory" as employed in section 3(d) of the Rate Act, 40 P.S. § 1183(d) (1971). That phrase is not defined in the Rate Act itself. The Commissioner concluded that he was compelled to interpret the statutory prohibition against "unfairly discriminatory"

shall find that the application is made in good faith, that the applicant would be so aggrieved if his grounds are established, and that such grounds otherwise justify holding such a hearing, he shall, within thirty (30) days after receipt of such application, hold a hearing upon not less than ten (10) days written notice to the applicant and to every insurer and rating organization which made such filing.

If, after such hearing, the Commissioner finds that the filing or a part thereof does not meet the requirements of this Act, he shall issue an order specifying in what respects he finds that such filing or a part thereof fails to meet the requirements of this Act, and stating when, within a reasonable period thereafter, such filing or a part thereof shall be deemed no longer effective....
40 P.S. § 1185(b) (1971).

rates in a manner consistent with the strong public policy against gender-based discrimination under law as expressed in Pennsylvania's Equal Rights Amendment. Appellants Hartford and State Farm attack that conclusion arguing in favor of a narrow interpretation of the phrase which would limit the prohibition of section 3(d) to rates which are not "actuarially sound." Under the latter view the Rate Act would not only permit insurers to impose gender-based rates but would also prohibit the Commissioner from denying approval to such rates provided the insurer is able to support them with actuarial data.[5]

In the proceedings before the Commissioner, Mattes established conclusively that Hartford required him to pay a significantly higher premium than a similarly situated woman would be charged for identical Hartford coverage solely on the basis of his gender. There is no attempt to suggest that Mattes was not in fact discriminated against because of his sex. The inquiry must begin by accepting that a gender-based discrimination exists. The question to be resolved is whether such discrimination falls within the parameters of the Rate Act's prohibition against "unfairly discriminatory" rates.

Appellants' basic argument is that "unfair" should be limited in meaning to *"actuarially* unfair". Appellants maintain that the Rate Act's prohibition of "unfairly discriminatory" rates relates only to "variations in prices or rates that have no relationship to costs or the risk of loss". Brief for Hartford at 27. Their proffered construction of the Rate Act must be rejected for several reasons.

Appellants base their argument largely on the legislative history of a model statute on which the Rate Act was based. In any event, the legislative history is unpersuasive. Appellants rely on a 1947 report to the National Association of Insurance Commissioners urging the adoption of a model statute drafted in response to the McCarron-Ferguson Act,

5. Under section 5(c) of the Rate Act, 40 P.S. § 1185(c), the Commissioner has no power to disapprove a filing or a modification unless a violation can be established.

15 U.S.C. §§ 1011 *et seq.*, which exempted the insurance business from federal antitrust laws to the extent that it was regulated by state law. They argue that the target of the Rate Act's prohibition, therefore, is the type of price discrimination which would violate the antitrust laws. Even assuming *arguendo* that this proposition logically follows, appellants fail to justify its application to the Pennsylvania Rate Act. There is no evidence that the General Assembly made use of the report or that the Rate Act was enacted in response to the McCarron-Ferguson Act. Thus it cannot be presumed that the report reflects the legislature's intent. To the contrary, the legislative response to the McCarron-Ferguson Act was the original Unfair Insurance Practices Act, Act of June 5, 1947, P.L. 445, § 1, 40 P.S. §§ 1151 *et seq.* (repealed 1974), as is explicitly stated in section 1 thereof, 40 P.S. § 1151. There is no reason to believe that the Rate Act was an additional response as claimed by appellants.

Second, the legislature has directed that the Rate Act "shall be liberally construed to carry into effect its purposes ...." 40 P.S. § 1181 (1971). The principal purpose of the Rate Act is "to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory; ...." *Id.* Appellants' interpretation would be the antithesis of a liberal construction, and would severely limit the ability of the Commissioner to effectuate one of the three principal goals of the Rate Act, the prevention of unfairly discriminatory rates.

█  Third, "[e]very statute shall be construed, if possible, to give effect to all its provisions". 1 Pa.C.S. § 1921(a). Appellants' interpretation would render the phrase "unfairly discriminatory" mere surplusage. *See Colodonato v. Consolidated Rail Corp.*, 504 Pa. 80, 470 A.2d 475 (1983); *Matter of Employees of Student Services, Inc.*, 495 Pa. 42, 432 A.2d 189 (1981); *Masland v. Bachman*, 473 Pa. 280, 374 A.2d 517 (1977); *Consumers Education and Protective Association v. Nolan*, 470 Pa. 372, 368 A.2d 675 (1977);

*Daly v. Hemphill*, 411 Pa. 263, 191 A.2d 835 (1963). Section 3(c) of the Rate Act, 40 P.S. § 1183(c), establishes the requirement of actuarial fairness by permitting an insurer to vary rates within a class only where the risk insured can be "demonstrated to have a probable effect upon losses or expenses." If actuarial fairness were the only concern of the Rate Act, the proscription of "unfairly discriminatory" rates contained in section 1 and 3(d) would be redundant and of no independent effect; satisfaction of section 3(c) would be dispositive of the requirement of actuarial soundness. In order to give meaning to that proscription, the "fairness" of rates must be recognized as a legislative concern distinct from and transcending the need for sound actuarial justification. Thus we conclude that section 3(d) manifests separate legislative objectives which represent the recognition that a rate may be justified by the actuarial data offered in its support, yet unfair in its underlying assumptions and its application to the individual. Accordingly, appellants' narrow, technical view of the Rate Act's mandate of "fairness" must be rejected.

We must next consider whether the Commissioner was justified in looking to the Pennsylvania Equal Rights Amendment in his determination of whether Hartford's gender-based rate plan was "unfair." Appellants seek to characterize the Commissioner's disapproval of Hartford's rate plan as an unauthorized attempt to impose his personal theories and perceptions of social policy upon the insurance industry. We disagree. As we have already concluded, it was appropriate for the Commissioner to look beyond actuarial statistics in evaluating the fairness of Hartford's discriminatory rates. Since those rates were based on the gender of the insured, the Equal Rights Amendment was necessarily relevant.

The Equal Rights Amendment was adopted by the voters of this Commonwealth on May 18, 1971. The Amendment provides:

**Prohibition against denial or abridgement of equality of rights because of sex**

Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.

Pa. Const. Art. I, § 28.

In *Henderson v. Henderson,* 458 Pa. 97, 327 A.2d 60 (1974), this Court explained the purpose and effect of the new constitutional amendment:

> The thrust of the Equal Rights Amendment is to insure equality of rights under the law and to eliminate sex as a basis for distinction. The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and responsibilities. The law will not impose different benefits or burdens upon the members of a society based on the fact that they may be man or woman.

*Id.,* 458 Pa. at 101, 327 A.2d at 62.

We have not hesitated to effectuate the Equal Rights Amendment's prohibition of sex discrimination by striking down statutes and common law doctrines "predicated upon traditional or stereotypic roles of men and women ...." *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 299–300, 368 A.2d 635, 639 (1977) (plurality opinion) ("Tender years doctrine" offends concept of equality of the sexes embraced in Equal Rights Amendment.); *see Adoption of Walker,* 468 Pa. 165, 360 A.2d 603 (1976) (Adoption Act's failure to require parental consent of unwed father as well as unwed mother violates Equal Rights Amendment.); *Butler v. Butler,* 464 Pa. 522, 347 A.2d 477 (1975) (Presumption that where husband obtains his wife's property without adequate consideration a trust is created in his wife's favor abolished.); *Commonwealth v. Santiago,* 462 Pa. 216, 340 A.2d 440 (1975) (Doctrine of "coverture" requiring presumption that wife who commits crime in presence of husband was coerced by husband discarded.); *Di Florido v. Di Florido,* 459 Pa. 641, 331 A.2d 174 (1975) (Presumption that husband is owner of household goods used and possessed by both spouses abolished.); *Common-*

*wealth v. Butler*, 458 Pa. 289, 328 A.2d 851 (1974) (Statutory scheme under which women are eligible for parole immediately upon incarceration while men must serve minimum sentence violates Equal Rights Amendment.); *Henderson v. Henderson, supra* (Statute providing for alimony pendente lite, counsel fees and expenses in divorce action for wife but not husband violates Equal Rights Amendment.); *Conway v. Dana*, 456 Pa. 536, 318 A.2d 324 (1974) (Presumption that father must bear principal burden of support of minor children abolished.); *cf. Hopkins v. Blanco*, 457 Pa. 90, 320 A.2d 139 (1974) (Equal Rights Amendment requires that wife as well as husband be permitted to recover for loss of consortium.) Gender-based rates such as Hartford's rely on and perpetuate stereotypes similar to those condemned in the above cases.

The efficacy of such rates is questionable even on the actuarial level.

In terms of simplicity and consistency (i.e., stability and ease of verification), age, sex, and marital status receive high marks as rating factors. This is not the case from the viewpoint of causality. Causality refers to the actual or implied behavioral relationship between a particular rating factor and loss potential. The longer a vehicle is on the road, for example, the more likely it is that the vehicle may be involved in a random traffic accident; thus, daily or annual total mileage may be viewed as a causal rating factor. To the extent that sex and marital status classifications may be defended on causal grounds, the implied behavioral relationships rely largely on questionable social stereotypes .... Given the significant changes in traditional sex roles and social attitudes which have occurred in recent years, justifications for rating plans on the grounds of such implied assumptions are unacceptable.

. . . .

... [P]ublic policy considerations require more adequate justification for rating factors than simple statistical correlation with loss; in this regard, the task force recom-

mends consideration of criteria such as causality, reliability, social acceptability, and incentive value in judging the reasonableness of a classification system. Based on these criteria, the task force concludes that as rating characteristics, sex and marital status are seriously lacking in justification and are subject to strong public opposition, and should therefore be prohibited as classification factors.

National Association of Insurance Commissioners. *Report of the Rates and Rating Procedures Task Force of the Automobile Insurance (D3) Subcommittee, November, 1978* at 5–6 (footnotes omitted).

As a matter of public policy, the Insurance Commissioner found that a rate plan based upon gender is offensive to the spirit of Article I, section 28. Appellants argue that Article I, section 28 is not self-executing. Furthermore, they attempt to employ the state action concept of our federal system and argue that here no such action occurred. These arguments are also misplaced in this context.

█ First, it is not a question as to whether or not Article I, section 28 is self-executing since we are here concerned with the proper interpretation of a legislative enactment. The question presented, properly phrased, is whether the term "unfairly discriminatory" must be read in light of the Equal Rights Amendment to our Pennsylvania Constitution. Unquestionably, sex discrimination in this Commonwealth is now unfair discrimination. It is a cardinal principle that ambiguous statutes should be read in a manner consonant with the Constitution. To read the term "unfairly discriminatory" as excluding sex discrimination would contradict the plain mandate of the Equal Rights Amendment to our Pennsylvania Constitution. Therefore, we must affirm the decision of the Insurance Commissioner. We must do so because the statute must be interpreted to include sex discrimination as one type of unfair discrimination, and not because the Commissioner has the power to implement the public policy of this Commonwealth in the absence of legislative direction.

■ Further, the notion that the interpretation of this insurance statute involves the concept of "state action" is incorrect in this context. The "state action" test is applied by the courts in determining whether, in a given case, a state's involvement in private activity is sufficient to justify the application of a federal constitutional prohibition of state action to that conduct. The rationale underlying the "state action" doctrine is irrelevant to the interpretation of the scope of the Pennsylvania Equal Rights Amendment, a state constitutional amendment adopted by the Commonwealth as part of its own organic law. The language of that enactment, not a test used to measure the extent of federal constitutional protections, is controlling.

■ The text of Article I, section 28 makes clear that its prohibition reaches sex discrimination *"under the law."* As such it circumscribes the conduct of state and local government entities and officials of all levels in their formulation, interpretation and enforcement of statutes, regulations, ordinances and other legislation as well as decisional law. The decision of the Commissioner in a matter brought pursuant to the Rate Act is not only "under the law" but also, to the extent his adjudication is precedent on the question decided, "the law." The Commissioner, as a public official charged with the execution of the Rate Act and sworn to uphold the Constitution and laws of this Commonwealth, Pa.Const. Art. 6, § 3; Act of June 4, 1879, P.L. 99, § 1, 71 P.S. § 761 (1962), was constrained to conform his analysis of Hartford's rate plan and his interpretation of section 3(d) of the Rate Act to Article I, section 28.

■ Thus, in light of the Pennsylvania Constitution's clear and unqualified prohibition of discrimination "under the law" based upon gender, we conclude that the Commissioner's disapproval of Hartford's discriminatory sex-based rates on the ground they were "unfair" and contrary to established public policy was in conformity with section 3(d) of the Rate Act and an appropriate exercise of his statutory authority.

Accordingly, the Order of the Commonwealth Court affirming the adjudication of the Insurance Commissioner is affirmed.

FLAHERTY, J., joins in this opinion and files a concurring opinion in which HUTCHINSON, J., joins.

HUTCHINSON joins in this opinion and files a concurring opinion, FLAHERTY, J., joins.

McDERMOTT, J., files a dissenting opinion in which ZAPPALA, J., joins.

ZAPPALA, J., files a dissenting opinion in which McDERMOTT, J., joins.

FLAHERTY, Justice, concurring.

I join in the opinion authored by Mr. Chief Justice Nix, but write separately to emphasize that, were it not for the Equal Rights Amendment, Pa. Const. Art. I, § 28, resort to gender-based insurance rate classifications would not be "unfairly discriminatory" under 40 P.S. § 1183(d) (1971), since such classifications may indeed be actuarily sound. Nevertheless, the Equal Rights Amendment was adopted as an expression of the people's will on gender-based classifications, and, constrained by this constitutional mandate that "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual," our role is not to seek to circumvent its effect.

HUTCHINSON, J., joins this concurring opinion.

HUTCHINSON, Justice, concurring.

I join both the Majority Opinion by the Chief Justice and the Concurring Opinion by Mr. Justice Flaherty. I add, however, that I believe the *ratio decidendi* of both those opinions lies solely in the interpretation of the phrase "unfairly discriminatory" contained in Section 3(d) of the Rate Act. "Unfairly discriminatory" as a linguistic construct is, like "due process", available for use in accommodating the

changes in policy required by changing social conditions. Such constructs are indispensable in a government based on a written constitution. They enable its fundamental precepts to survive, even as their application alters under technological and social change.

This is not to say that the courts are free to rewrite the meaning of a constitution or statute at will. However, when a change in social policy in response to changed conditions has been objectively demonstrated by the people's adoption of a constitutional amendment, it is incumbent upon the courts to read existing statutes in the light of the people's newly enunciated policy.

The wisdom of that policy is no longer an issue in Pennsylvania. Nationally, the debate over the desirability of an equal rights amendment still rages in the political arena. Indeed, its proponents have recently suffered a defeat at that level in their efforts to write that policy into the federal constitution. For better or for worse, however, Pennsylvania has settled that issue in favor of ERA.

Thirteen years after our adoption of Section 28 of Article I, the Pennsylvania Equal Rights Amendment, I believe we must honor its command and consider sex discrimination of any kind "unfairly discriminatory" unless the legislature plainly tells us otherwise. Absent at least a causal relation between sex and accident incidence a difference in auto insurance rates between men and women is plainly an unfair discrimination based on sex. No causal connection is shown on this record. What does appear is only a statistical correlation between sex and the incidence of auto accidents. This correlation simply provides a convenient measuring rod for setting rate differentials occasioned by other factors not so easily identified or quantified. Such considerations of convenience are not enough to stand in the face of our ERA. Given our ERA's clear statement of public policy in Pennsylvania, I see no need to raise potential federal questions of (a) whether the setting of insurance rates involves "state action", (b) whether this state should adopt the standards developed under the Fourteenth

Amendment for detecting its presence or (c) how the standards should be defined in the light of *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). On those issues I express no opinion, and, believing the Majority Opinion also refrains from such speculation, I join it.

I also join Mr. Justice Flaherty because without the Pennsylvania ERA, or some other affirmative statement of legislative policy, the Insurance Commissioner would lack the authority to redefine the statutory phrase "unfairly discriminatory" in the face of the insurance industry's long standing practice of utilizing gender based rate differentials. We are obligated to affirm his action only because the ERA objectively demonstrates, in the most forceful possible way, the feeling of the people of this state that sex discrimination is unfair.

FLAHERTY, J., joins this concurring opinion.

McDERMOTT, Justice, dissenting.

Young women drivers, for actuarial purposes, have hitherto constituted a class. Among their other winsome ways, they have proved less accident prone than their young male counterparts. Insurance premiums were computed according to their actuarial experience as a class: being less accident prone, they received the concomitant benefit of lower premiums.

The Insurance Commissioner has, upon his own, decided that whatever the actuarial experience of young women as a class, young women are persons and should bear no actuarial adjective; that just because they are women, they cannot be classified different from men.

Such considerations doubtless have their place, even when they rub the paradox that to be fair to all we must be unfair to some. To deny persons access to a class or remove them from a classification, to which, for all present purposes,

they are entitled, may settle a larger issue and serve larger purposes. That is not, however, for the Insurance Commissioner to say.

In the principality of Problematica, there are mansions, pre-fabs and tents, good actors, non-actors, warm, cold and indifferent. How many of a class will see the sunset of a given day, heed the call to matins, bend a fender, choose orange over strawberry or leave for Katmandu? Give or take a scoop, actuaries have a better hunch for hedging bets than a rabbit's foot or knocking wood.

In this regard, gender may become pertinent as a pragmatic factor, and not a philosophic or natural distinction. Pragmatic factors of occupation, duties and functions, place, occasion and means are neutral gender qua gender. It may well be that a social policy dictates that all classifications that distinguish men from women, young from old, sick from well, are inherently unfair.[1] However, such a policy should be promulgated by more authority than that possessed by an Insurance Commissioner, or under these circumstances, this Court, for the function of fostering social policy is the duty and prerogative of the Legislature.

I dissent upon several grounds, the first being that the Commissioner went beyond his function as an administrator to foster a social policy. To do so, the Commissioner took words of art and painted a picture, not from the palette provided by the Legislature, but with his own jackhammer.

To reach his conclusion that it is unfair to classify young women differently than young men, he seized upon the words "unfairly discriminatory", as used in the Rate Act[2], and determined that they mean something new and different than they meant when the Act was written, and which,

---

1. Insurance rate classification inherently envisions *some* discrimination. In this uneven world, some urban areas generate more occasion for accident. Persons living in them by choice or necessity bear higher premiums. The ideal classification would be homogeneous, practical and objective, so the factors would be beyond manipulation.

2. Act of June 11, 1947, P.L. 538 § 1, 40 P.S. § 1181, *et seq.*

until he changed their meaning, were settled words of art and precision.

"Unfairly discriminatory" are large words and may seem upon their face to warrant altering regulations to fit any doctrine of fairness conceived by a Commissioner. The fact is, however, that they were not addressed to conscience at large, but were confined to a specific area and a specific purpose. Their specific purpose was the maintenance of actuarial soundness in insurance rates; that is to maintain a reasonable relationship between a proposed rate for a particular class and the risk posed by members of that class. The Commissioner was not empowered to classify, he was directed to assure that a proffered premium for a class reflected sound actuarial components. The issue here is not his authority to supervise the construction of a class, but his authority to deny a classification based not on actuarial soundness, but rather upon his social philosophy.

"Unfairly discriminatory" has a settled and precise meaning in and for the industry it was designed to regulate. Here, a little history validates a volume of logic. The logic is contained in the Statutory Construction Act:[3] plain words must be accepted for their plain meaning; technical words and phrases which have acquired a peculiar or precise meaning are construed as understood and meant for the field for which they were designed.

In this case, the logic of considering "unfairly discriminatory" as words of precise, technical meaning is validated by the history that gave them rise. The Rate Act's passage was precipitated by a United States Supreme Court decision which held that the insurance industry was subject to federal antitrust laws. *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). In response to *South-Eastern*, Congress passed the McCarran-Ferguson Act,[4] allowing the states to pre-empt the field and relieve insurance companies from

**3.** Act of December 6, 1972, P.L. 1339, No. 290, § 3, 1 Pa.C.S. § 1901 *et seq.*

**4.** Act of March 9, 1945, c. 20, 59 Stat. 33, 15 U.S.C. § 1011 *et seq.*

federal antitrust enforcement. *See Panhandle Eastern Pipe Line Co. v. Public Service Comm.,* 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947). The Act, based on a model act designed by the National Association of Insurance Commissioners, was passed to shield insurers against antitrust enforcement under the Robinson-Patman Act[5] which was partly aimed at inhibiting unfair price differences. It is evident that the "unfairly discriminatory" language was intended to specifically prohibit variations in rates which have no relationship to the insurers' costs or risks of loss. It was not intended to promote broad social policy concerns. *See Pennsylvania Insurance Department v. Philadelphia,* 196 Pa.Super. 221, 227, 173 A.2d 811, 820 (1961); *see generally,* 5 Couch on Insurance § 30:49 at 564 (1960).

The logic is further indicated in looking at cases where proposed rates have been found to be unfairly discriminatory. For instance, in *Physicians Mutual Insurance Co. v. Denenberg,* 15 Pa.Cmwlth.Ct. 509, 515, 327 A.2d 415, 418 (1974), the Commonwealth Court affirmed the Commissioner's finding of unfair discrimination concerning a one dollar flat charge added on to every initial premium since it "is applied to all policies regardless of the risk insured". In another case, the Insurance Commissioner rejected a rate filing which rewarded a young insured who gained good grades in school because "the good student discount bears scarcely any valid relationship to the driving hazard; it is unfairly discriminatory within the meaning of the Act." Adjudication order of David O. Maxwell (April 6, 1968).

This interpretation of "unfairly discriminatory" is also evident in examining cases from other jurisdictions involving statutes analogous to our own Rate Act. In a case very similar to this one, a Louisiana court reversed an Insurance Commissioner's conclusion that a rating plan using sex and age was unfairly discriminatory. "[C]lassifications based on age and sex are not unreasonable, and, although there is discrimination against the good, young driver, it is not

5. Act of October 15, 1914, c. 323, § 2, 38 Stat. 730, 15 U.S.C. § 13 *et seq.*

unfair or unreasonable." *Insurance Services Office v. Commissioner of Insurance,* 381 So.2d 515 (La.Ct.App. 1979), *writ of review denied,* 382 So.2d 1391 (La.1979). The Florida Insurance Commissioner's effort to bar the use of sex, marital status and scholastic achievement as automobile insurance rating factors was also thwarted. *State of Florida, Department of Insurance v. Insurance Services Office,* 434 So.2d 908 (Fla.App.Dist.1983), *pet. for rev. denied,* 444 So.2d 416 (Fla.1984). The court held the use of the factors not to be unfairly discriminatory. Indeed, the use of those factors "enhanced the actuarial soundness of a rate classification for automobile insurance." *Id.* at 912–913. Further, the court found the attempted regulation to be an invalid exercise of delegated legislative authority. *State of Florida, supra,* at 911–12. *See also, Thompson v. IDS Life Insurance Co.,* 274 Or. 649, 549 P.2d 510 (1976); *see generally* Austin, *The Insurance Classification Controversy,* 131 U.Pa.L.Rev. 517 (1983).

In this case, Hartford presented evidence showing that there was a direct relationship between the higher rate charged to young men and the risk young men pose on the highway. Undisputed statistical evidence revealed that young males are more likely to be involved in automobile accidents than similarly situated female drivers. For example, in the 25–29 age group, there were 7.28 accidents per one hundred licensed male drivers in Pennsylvania compared to only 2.96 accidents per one hundred licensed females. (Pennsylvania Insurance Commission Hearing [hereinafter ICH] at 40–41.) The average loss for insured vehicles also evidences the disparity: In the 17–20 age group, unmarried females experience an average loss of $195, while similarly situated males show an average loss of $255 [6] (ICH at 43.) Given these facts, the use of gender in classifying insurance rates was actuarially sound and not unfair or unreasonable.

6. "Average Loss per Insured Vehicle—Bodily Injury, Property Damage, Comprehensive and Collision Combined—Countrywide," Insurance Services Office.

Indeed, to exclude the use of gender in the classification of automobile insurance rates violates the intended definition of "unfairly discriminatory" and the intent of subsection 3(d); and unfairly treats as alike those who are, at least on the highways, demonstratively different. This will translate into excessive rates for young women and inadequate rates for young men who, according to actuaries, pose a far greater insurance risk.[7] Nevertheless, the Commissioner, without regard to the actuarial soundness of the proposed filings, rejected the filings based on his perception of public policy. In so doing the Commissioner abused his discretion, venturing beyond the power granted to him by the Legislature in the Rate Act.

An administrator can only act within the boundaries set by the Legislature. *Pennsylvania Human Relations Commission v. Mars Community Boys Baseball Association*, 488 Pa. 102, 104, 410 A.2d 1246, 1247 (1980) (Opinion in support of affirmance); *Pennsylvania Human Relations Commission v. St. Joe Minerals Corporation*, 476 Pa. 302, 310, 382 A.2d 731, 736 (1978); *Green v. Milk Control Commission*, 340 Pa. 1, 3, 16 A.2d 9 (1940), *cert. denied*, 312 U.S. 708, 61 S.Ct. 826, 85 L.Ed. 1140 (1941). ("The principle guiding to decision is this: The power and authority to be exercised by administrative commissions must be conferred by legislative language clear and unmistakable. A doubtful power does not exist.... They should act within the strict and exact limits defined.") An administrator may not create his own jurisdiction by insisting that those he regulates subscribe to his view of what public policy requires. *Western Pennsylvania Water Co. v. Pennsylvania Public Utility Commission*, 471 Pa. 347, 353, 370 A.2d 337, 340 (1977); *Drexelbrook Associates v. Pennsylvania Public Utility Commission*, 418 Pa. 430, 212

7. At a hearing, Hartford produced evidence showing that an end to the use of gender in setting auto insurance rates would result in a sizable increase in insurance rates paid by females and a decrease in rates for men. In the 25–29 age group, for example, the rate for unmarried females would jump 36% while the rate for unmarried males would decrease by 19%.

A.2d 237 (1965). Thus, the Legislature sets the "basic policy choices which serve as standards to guide and restrain the exercise of discretion," *Tosto v. Pennsylvania Nursing Home Loan Agency*, 460 Pa. 1, 11, 331 A.2d 198, 202–203 (1975); *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 212, 346 A.2d 269, 291 (1975), and the administrator must act within those restraints.

Here, the Legislature acted appropriately with regard to the Rate Act, and its grant of discretion and authority to the Insurance Commissioner. The basic policy behind the Act was set: that there must be a reasonable relationship between proposed insurance rates for a particular class and the risk posed by members of that class.

Our Legislature set adequate standards to guide and restrain the Commissioner. The vice here was that the Insurance Commissioner freed himself of the restraints and strayed far beyond his statutory authority, broadly construing the language of the Act, allowing him to impose his own interpretation of the Commonwealth's public policy onto the insurance rate filing system.

In this regard, it is significant that the Legislature, following the passage of the Equal Rights Amendment in 1971, had the opportunity on two occasions to outlaw the usage of gender-based classifications in insurance rates but specifically chose not to do so. In 1974, the Legislature revised the Unfair Insurance Practices Act,[8] prohibiting discrimination based on sex. But the prohibition did not extend to the setting of rates "if made or promulgated in accordance with the appropriate rate regulatory act." 40 P.S. § 1171.5(a)(7)(iii). The 1974, No-Fault Act also prohibited discrimination on the basis of sex, but specifically exempted rate promulgation from that prohibition.[9]

8. Act of July 22, 1974, P.L. 589, No. 205, § 1 *et seq.* 40 P.S. § 1171.1 *et seq.*

9. Pennsylvania No-Fault Motor Vehicle Insurance Act, Act of July 19, 1974, P.L. 489, No. 176, Art. V, § 502, 40 P.S. § 1009.502. The No-Fault Act was repealed by the Legislature this year and was replaced with the Motor Vehicle Financial Responsibility Law which

Nevertheless, the majority endorses the Commissioner's overextension of his authority, allowing any unelected executive official the green light to interpret specific statutory language broadly and act, like a lone conscience, impressing his own theory of public policy upon the Commonwealth. Thus, with the majority's holding, the vital lines that separate the three spheres of government become ever more illusive.

The Commissioner did not rest solely on the "unfairly discriminatory" prohibition. He also relied on language in subsection (a) of the Rate Act. That subsection sets out various factors to be considered in setting rates, such as past and prospective loss experience, physical hazards, expenses and "all other relevant factors within and outside this Commonwealth". The Commissioner interpreted the latter language as allowing him to examine public policy considerations, specifically the Pennsylvania Equal Rights Amendment, Pa.Const. Art. I, § 28, which provides:

Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.

The Commissioner correctly concluded that he could not premise his adjudication solely on the Equal Rights Amendment, since the regulation of insurance rates fails to constitute sufficient state action. Before it is implicated, our Equal Rights Amendment, like the 14th Amendment of the United States Constitution, requires that the state be somehow involved in the denial or abridgement of rights. Neither provision seeks to regulate private conduct.

In *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the United States Supreme

does not contain an anti-discrimination section. Act of February 12, 1984, P.L. ——, No. 11, § 8.

We note also that the Commissioner adjudicated this case in the face of an Insurance Commission regulation which prohibits insurers from denying benefits or coverage on the basis of sex, but specifically, "does not prohibit insurers from differentiating in premium rates between sexes where there is sound actuarial justification." 31 Pa. Code § 145.1 (1977).

Court found no state action in the Pennsylvania Public Utility Commission's mere approval of a utility's general tariff application. "The mere fact that a business is subject to state regulation does not itself convert its action into that of the state." *Id.*, at 350, 95 S.Ct. at 453. The Supreme Court very recently repeated that language in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). In *Murphy v. Harleysville Mutual Insurance Co.*, 282 Pa.Super. 244, 422 A.2d 1097 (1980) *cert. denied*, 454 U.S. 896, 102 S.Ct. 395, 70 L.Ed.2d 211 (1981), the Superior Court found that the Commonwealth's regulation of insurance rates was insufficient state action to implicate the Equal Protection Clause of the 14th Amendment or the Equal Rights Amendment. In *Broderick v. Associated Hospital Service of Philadelphia*, 536 F.2d 1, 5 (3d Cir. 1976), the third circuit held that the mere fact that insurance companies contracts and rates are approved by the state "does not transform what is essentially private action into state action" and thus the plaintiffs' § 1983 action was appropriately dismissed. *See also, Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); *Adler v. Montefiore Hospital Association*, 453 Pa. 60, 68–69, 311 A.2d 634, 639 (1973) *cert. denied*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974) ("We recognize at the outset that the Fourteenth Amendment of the Constitution of the United States applies to 'state action' and not to private conduct."); *Jackson v. Associated Hospital Service*, 414 F.Supp. 315 (E.D.Pa.1976) *aff'd without opinion* 549 F.2d 795 (3d Cir.1977), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977) (That the Pennsylvania Insurance Commissioner statutorily regulated Blue Cross and Blue Shield contract rates did not transform those rates into state action.). Note, *State Action After Jackson v. Metropolitan Edison Co.: Analytical Framework for a Restrictive Doctrine*, 81 Dick.L.Rev. 315 (1977). While the above mentioned cases were decided under the 14th Amendment of the United States Constitu-

tion, the analogy is a close one. The Pennsylvania Equal Rights Amendment protects rights "under the law," as does the 14th Amendment.

The Insurance Commissioner's regulation of the rates of private insurance companies for private customers does not constitute state action. Thus, there was an insufficient predicate to trigger the ERA,[10] or to permit the Commissioner the freedom to bar gender based classifications in setting insurance rates based on the ERA.[11]

**10.** I also note that .the few authorities to consider the issue have all determined that state action is required to trigger the ERA. *United States Jaycees v. Massachusetts Commission Against Discrimination,* 391 Mass. 594, 609, n. 9, 463 N.E.2d 1151, 1160, n. 9 (1984) ("To be sure, the constitutional provision prohibition of discrimination based on sex expressed in art. 1 of the Declaration of Rights [the Massachusetts ERA] is directed at state action."); *MacLean v. First Northwest Industries of America,* 24 Wash.App. 161, 600 P.2d 1027 (1979), *rev'd. on other grounds,* 96 Wash.2d 338, 635 P.2d 683 (1981), *citing Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882 (1975); *Junior Football Association of Orange v. Gaudet,* 546 S.W.2d 70, 71 (Tex.Civ.App.1976); Note, 14 Duq.L.Rev. 101, 105 (1975); Brown, Emerson, Falk and Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women,* 80 Yale L.J. 871, 905 (1971).

**11.** I note also that the majority quickly dismissed the consequential question of whether the ERA is self-executing. I would hold that, like the 14th Amendment of the United States Constitution, our ERA requires effectuating legislation to enable the Insurance Commissioner to bar gender based classifications in insurance rates. Rather than enacting such implementing legislation, the Legislature on two occasions since the enactment of the ERA has specifically *allowed* the use of gender based classifications in insurance rates.

*See Pennsylvania Human Relations Commission v. Mars Community Boys Baseball Association,* 488 Pa. 102, .410 A.2d 1246 (1980) (Opinion in support of affirmance per Justice, now Chief Justice Nix): Without a specific grant of power under the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, 43 P.S. § 953 or under the ERA, the Human Relations Commission could not take steps to end gender discrimination in public accommodations. The Human Relations Commission had the power to investigate and pass upon "unlawful discriminatory practices," 43 P.S. § 957(f), but, until 1978, was only given the power to remedy discrimination in places of public accommodation on the basis of "race, color, religious creed, ancestry or national origin," not gender. 43 P.S. § 953. And while the ERA was in effect at the time the Human Relations Commission sought to act, the Legislature failed to enact implementing legislation until 1978. Act of October 4, 1978, P.L. 909, No. 173, § 1, 1 Pa.C.S. § 2301. Thus, the Human Relations Commission lacked the power prior to 1978 to

Further, the Commissioner erred in looking to the ERA under subsection (a) of the Rate Act. Under the statutory construction principle of *ejusdem generis*, the consideration of "all other relevant factors" is limited to factors similar to the ones specifically listed in subsection (a), i.e., expenses, losses and hazards; and does not extend to public policy considerations. *See* Statutory Construction Act, 1 Pa.C.S. § 1903(b); *Pennsylvania Industries for the Blind and Handicapped v. Larson*, 496 Pa. 1, 5, 436 A.2d 122, 123 (1981); *Butler Fair and Agricultural Association v. Butler School District*, 389 Pa. 169, 178, 132 A.2d 214, 219 (1957).

Since the public policy concerns which were considered by the Commissioner were substantially different than the pure actuarial factors listed in subsection (a), I would hold that the Commissioner erred in construing the phrase "all other relevant factors" to permit him to impose his view of public policy onto Hartford's rate filing based on the ERA.

Believing that the Commissioner strayed beyond his statutory authority in finding that the use of gender based classifications in insurance rates was unfairly discriminatory, I would reverse the Commonwealth Court order.

ZAPPALA, J., joins in this dissenting opinion.

ZAPPALA, Justice, dissenting.

While I join with the reasoning of Mr. Justice McDermott's dissenting opinion, I am writing separately to express my concern about the unforeseen consequences of the majority's analysis.

The majority concludes that the rate classification plan of Hartford was properly disapproved because the rates rely upon and perpetuate sexual stereotypes similar to those which this Court has condemned. Upon review of the decisions cited by the majority, however, it is apparent that the issue presented by this appeal is critically different. In

fight gender based discrimination. Likewise, the Insurance Commissioner lacked the power to ban gender based classifications in insurance rates under the Rate Act or under the ERA.

the earlier cases, we construed statutes that were written as gender specific to include both sexes. We rejected the employment of presumptions which were based upon social prejudices or meritless characteristics ascribed to a class. Clearly such presumptions are anathematic to our legal system. But this reasoning cannot resolve the issue of whether different insurance rates for men and women, which are based upon a statistical analysis of projected risks and losses, are unfairly discriminatory.

The Equal Rights Amendment has no application to the regulation of insurance rates. The language of the Amendment—"under the law"—has long been interpreted to require state action. Today the majority has reduced it to a generic term. I am also deeply disturbed by the manner in which the majority interprets "under the law" as circumscribing decisional law.

There is no dispute that it is unfairly discriminatory to subject individuals who are in the same position to disparate treatment based upon gender. If the insurance rates here had been determined without reference to the projected loss experience of male and female drivers, the rates would be unfairly discriminatory. It is not unfairly discriminatory, however, to treat individuals who are not in the same position differently. It is self-defeating to suggest that similar individuals should be treated as such not only where differences do not exist, but also that they should be treated as the same where differences undeniably do exist. We are presented here with differences which exist, not those which are presumed or manufactured to reinforce social prejudices. By treating a class without reference to the actual characteristics of the class, the majority in fact adopts the discriminatory analysis which it has previously abhorred.

The holding of the majority opinion demonstrates we have not yet learned the lesson that in our zeal to rectify perceived discrimination, we may create discrimination.

McDERMOTT, J., joins in this dissenting opinion.